

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BP CORPORATION NORTH AMERICA INC. )
SAVINGS PLAN INVESTMENT OVERSIGHT )
COMMITTEE serving in its capacity as a named )
fiduciary of the BP Employee Savings Plan, the BP )
Capital Accumulation Plan, the BP DirectSave Plan, )
the BP Employee Savings Plan of Puerto Rico, and the )
BP Partnership Savings Plan under the BP Master )
Trust for Employee Savings Plans and the BP Solar )
Employee Savings Plan under the Trust for the BP )
Solar Employee Savings Plan, and BP )
CORPORATION NORTH AMERICA INC.   )    Judge William J. Hibbler
INVESTMENT COMMITTEE serving in its capacity )
as a named fiduciary of the BP Retirement )
Accumulation Plan and the Enstar Corporation )
Retirement Plan under the BP Master Trust for )
Employee Pension Plans, )
                                            )
                    Plaintiffs,             )
                                            )    CIVIL ACTION NO. 08-cv-6029
                                            )
            v.                              )
                                            )
NORTHERN TRUST INVESTMENTS, N.A. and )
THE NORTHERN TRUST COMPANY,           )
                                            )
                    Defendants.

## MEMORANDUM OPINION AND ORDER

The Plaintiffs, who oversee the pension funds on behalf of present and former employees of

BP Corporation North America, Inc., seek a preliminary injunction against Northern Trust

Investments (NTI), which serves as the investment manager for Plaintiffs and manages four index

funds in which the pension funds are invested, and Northern Trust Company (Northern), which

serves as the securities lending agent for NTI. The Plaintiffs allege that Northern and NTI violated

their fiduciary duties both in the way they managed the index funds and in amending the withdrawal guidelines in response to September 2008 market conditions.

## I. Factual Background

The Plaintiffs (hereinafter "the Plan Committees" or "the BP Plans") oversee the pension funds for retired and current employees of BP Corporation. (Plaintiff's Proposed Finding of Fact (PPFF) ¶¶ 2-5). The Plan Committees and NTI are parties to three Investment Manager Agreements, each of which directs NTI to invest a portion of the BP employees' pension in one of four Collective Index Funds ("the Index Funds"). (PPFF ¶¶ 8-10, 12-13, 16; Defendant's Proposed Finding of Fact (DPFF) ¶ 10). A Declaration of Trust identifies NTI as the trustee for each of the Index Funds for the benefit of the approximately 600 participating trusts (including the BP Plans) that participate in those funds. (DPFF ¶ 8). Collectively, the BP Plans have approximately $717 million invested in the Index Funds at issue. (DPFF ¶ 7).

Each of these Index Funds engages in securities lending. (PPFF ¶ 20; DPFF ¶¶ 6, 11). Ideally, securities lending offers the participating trusts the prospect of earning additional returns that offset the management of the fund and reduces tracking variances. (DPFF ¶ 12). Northern serves as the lending agent for NTI's securities lending activity. (DPFF ¶ 26). In short, NTI, through Northern, "lends" stocks or bonds it holds to certain borrowers, who must put up at least 102% of the market value of the securities. (DPFF ¶ 28; PPFF ¶ 25). As the value of the borrowed securities fluctuates, Northern adjusts the amount of collateral held; Northern acquires more collateral if the value of the borrowed securities increases and returns it if the value of the borrowed securities declines. *Id.* Northern then manages the collateral, investing it according to a set of investment guidelines, taking its fees as a percentage of the profits from the securities lending

2

program. (DPFF ¶¶ 44, 47-48). In this case, Northern established two collateral pools: the Core USA pool and the collective short term investment fund and the collective short term extendible portfolio (STIF/STEP Pool). (DPFF ¶ 46; PPFF ¶ 26). In accordance with the guidelines for the Core USA and STIF/STEP Pools, Northern invested the collateral in fixed-income debt securities. (DPFF ¶ 48).

In mid-September 2008, after nearly a year of stress caused by concerns over residential lending, Lehman Brothers declared bankruptcy, Bank of America acquired Merrill Lynch, and the government bailed out AIG. (DPFF ¶ 59). Shortly thereafter, the stock market plummeted and the credit market seized up. (DPFF ¶ 60). These events affected the assets held in the collateral pools: as investors became reluctant to acquire debt, the debt securities held as assets in the collateral pools became difficult to sell, but as the market plummeted collateral had to be returned to borrowers. (DPFF ¶¶ 60-67). As a result, Northern experienced a "collateral deficiency" in the Core USA Pool; the book value of the assets held in the pool was greater than the market value. (DPFF ¶ 70; PPFF ¶ 55). Northern wrote down the book value of the assets in this pool. (DPFF ¶ 71).[1] Similarly, the STIF/STEP Pool, which carries a market value that had been decreasing since the home lending crisis had begun in August 2007, suffered a sharp decline in value as a result of the September 2008 market events. (DPFF ¶¶ 76-78).

---

[1] Although securities lending ideally makes an index fund less risky, like any other investment it caries risks particular to it, including a risk of loss stemming from the investment of cash collateral.

In response to these events, Northern imposed safeguards limiting withdrawals from the Index Funds.[2]  (DPFF ¶ 90).  Under the guidelines, direct lending clients[3] who desired to immediately withdraw must provide Northern with sufficient cash to repay the borrowers of all loaned securities and then receive its share of the securities recalled from the loan and a pro-rated "slice" of the assets in the collateral pool. (DPFF ¶ 92; PPFF ¶ 77).  Direct lending clients could also "stay put," allowing the collateral pool assets to mature or make a "staged withdrawal" under which the client reduces its securities on loan gradually over a period of time.  (DPFF ¶ 94; PPFF ¶ 77).  Finally, direct lending clients could obtain its own custom collateral pool, accepting a pro-rated slice of the collateral pool assets.  (DPFF ¶ 94).

NTI chose to carve out a custom collateral pool for the benefit of the Index Funds and remain in Northern's lending program.  (DPFF ¶ 100).  Like Northern, NTI chose to create withdrawal guidelines for its participating trusts, who are indirect lending clients.[4]  Under NTI's guidelines, a participating trust may request a full redemption of its Index Fund shares and would receive its pro rata share of collateral pool assets.  (DPFF ¶ 106; PPFF ¶ 77).  In this case, the BP Plans would have received approximately $550 million in cash and approximately $160 million in units from

---

[2] Northern worried that, due to the losses suffered in the collateral pools, participants would withdraw from the lending program.  As participants withdrew, Northern would be forced to liquidate assets from the collateral pool to fund the withdrawals.  Northern worried, rightly or wrongly the Court need not determine here, that the liquidity of the pools would be compromised to a greater and greater degree as more participants withdrew, ultimately leaving some participants holding nothing but illiquid assets and bearing responsibility for a greater and greater portion of the losses sustained by the collateral pools.

[3] Direct lending clients own the securities that are lent to the borrower.  NTI, which serves as trustee of the Index Funds, is a direct lending client.  (DPFF ¶ 13).

[4] The BP Plans are "indirect lending clients" of Northern.  Rather than own securities that are lent, they own shares of Index Funds that lend securities.  (DPFF ¶ 14).

STIF/STEP and assets from CORE USA. (DPFF ¶ 110; PPFF ¶ 77). By October 2008, the STEP Collateral Pool was virtually illiquid. (PPFF ¶ 90).

The Committee Plans object to receiving a portion of their investment in collateral pool assets. In their request for injunctive relief, the Committee Plans seek disgorgement, restitution, and damages, as well as an order requiring the Defendants to distribute the BP Plans' assets in cash or as liquid securities.

## II. Standard of Review

To obtain a preliminary injunction, the moving party must show "'1) a reasonable likelihood of success on the merits, and 2) no adequate remedy at law and irreparable harm if preliminary relief is denied.'" *Graham v. Medical Mutual of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (quoting *Mil-Mar Shoe Co., v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996)). If the moving party clears this initial hurdle, the court must balance the irreparable harm to the moving party if the court denies the injunction against the irreparable harm to the non-moving party and nonparties if the court grants the injunction. *Id.* If a party cannot make a showing that it lacks an adequate remedy at law and will suffer irreparable harm, then the "court's inquiry is over and the injunction must be denied." *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). A court should not grant a preliminary injunction unless the movant, by a clear showing, carries the burden of persuasion. *Christian Legal Soc. v. Walker*, 453 F.3d 853, 870 (7th Cir. 2006).

## III. Discussion

Although the parties spend the bulk of their briefs discussing the likelihood that the Plaintiffs will succeed on the merits of their claims, the Court will first analyze whether they lack an adequate remedy at law and will suffer an irreparable injury. A preliminary injunction is an extraordinary

remedy, for it awards some form of equitable relief prior to a full hearing on the merits. *Christian Legal Soc.*, 453 F.3d at 870. Accordingly, a preliminary injunction is warranted only when harm that cannot be prevented or fully rectified by the final judgment after trial; the injury must be irreparable. *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *see also E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703-04 (7th Cir. 2005).

In this case, the Plaintiffs' underlying claim is one for damages: they believe the Defendants breached their fiduciary duties in running the securities lending program and that breached caused them an injury. Indeed, the bulk of their prayer for relief speaks to compensation for their loss. Generally, monetary damages or temporary loss of income do not constitute irreparable injury. *See Somerste House, Inc. v. Turnock*, 900 F.2d 1012, 1018 (7th Cir. 1990). As the Supreme Court observed, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed. 2d 166 (1974). The Seventh Circuit has identified four situations where a temporary loss of funds may constitute an irreparable injury: 1) where damages come too late to save a plaintiff's business; 2) where the plaintiff may otherwise be unable to finance the lawsuit; 3) where the defendant may become insolvent before the plaintiff is able to collect on a final judgment; and 4) where the nature of the plaintiff's loss may make damages difficult to calculate. *Roland Machinery Co.*, 749 F.2d at 386.

The first three exceptions identified by the Seventh Circuit clearly do not apply. This is not a case where Plaintiffs' viability as a business entity is at stake. The BP Plans have sufficient assets to conduct this litigation. They have presented no evidence that they might be unable to fund their

6

members pensions while the lawsuit is pending. Indeed, Defendants continue to allow Plaintiffs to make withdrawals in the ordinary course, allowing as much as $50 million in withdrawals since the withdrawal guidelines took effect. (DPFF ¶¶ 111-112). The Plaintiffs present a half-hearted assertion that the Defendants may become insolvent, but this claim lacks evidentiary support and the Court will not address this cursory argument.

The BP Plans argue, however, that they need an injunction to forestall irreparable harm caused by the Defendants' new withdrawal guidelines. The gravamen of their argument is that the guidelines force them to either allow Defendants continued control over the funds entrusted to the BP Plans despite the BP Plans' loss of confidence in Defendants' ability to manage those funds or to require the BP Plans to receive assets that are not of the kind they invested in. In either case, the BP Plans argue that "they cannot wait for a full trial on the merits to avoid the on-going and unanticipated risks" imposed upon them by the withdrawal guidelines of the Defendants' securities lending program. The BP Plans argue that both alternatives subject them to a loss of control over the BP Plans' funds. In short, they argue that the withdrawal guidelines — and corresponding loss of control over some amount of funds they have invested with the Defendants — makes their damages difficult to calculate.

Sometimes damages are difficult to calculate because an injury is intangible and not easily assigned a monetary value. For example, "[t]he loss of First Amendment freedoms, for even minimal periods of time," is difficult to quantify. *See Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 2680, 49 L.Ed.2d 547 (1976); *Somerset House, Inc.*, 900 F.2d at 1018 (citing *Elrod*, 427 U.S. 347, 96. S.Ct. at 2680). Similarly, in a damage to a parties business reputation causes an irreparable harm. *See Duct-o-Wire Co. v. U.S. Crane, Inc.*, 31 F. 3d 506, 509-10 (finding irreparable injury

7

where defendant subscribed purposefully to a previous phone number used by plaintiff and led callers to believe it was plaintiff's agent); *but see E. St. Louis Laborers' Local 100*, 414 F.3d at 704 (declining to issue preliminary injunction on the basis of speculative injury to union's reputation).

In other instances, damages might be difficult to calculate because of the complexity of the injury. *See Local Lodge No. 1266, Int'l Assoc. Of Machinists & Aerospace Workers, AFL-CIO v. Panoramic Corp.*, 688 F.2d 276, 286 (7th Cir. 1981). In *Local Lodge No. 1266*, the Defendant desired to sell one of its divisions, which employed 113 workers. *Id.* at 277-78. The union representing the workers alleged the sale violated the collective bargaining agreement and sought a preliminary injunction pending the ruling of an arbitrator. *Id.* at 278. The Seventh Circuit affirmed the district court's decision to grant the injunction, noting that the permanent loss of 113 jobs constituted an irreparable injury in part because of the difficulty, if not impossibility, of calculating damages suffered by the workers. *Id.* at 286-87.

Here, the Plaintiffs fail to explain fully explain why damages are difficult to calculate. Under the withdrawal guidelines, the BP Plans receive approximately 80% of the Index Fund assets in cash or securities and 20% in the form of assets from the collateral pool.[5] If the BP Plans chose to retain the collateral pool assets until they mature or until they become more marketable, the loss caused by Defendants' withdrawal plans could be fixed at the point of maturity or the point of sale. At the same time, if the Plaintiffs chose to liquidate the collateral pool assets at a substantial loss, engaging in a "fire sale," the amount of their loss is also fixed at the time of the sale. The ability to engage

---

[5] And some of the assets in the collateral pools is liquid, though neither party identifies precisely what percentage is easily liquidated.

in such a fire sale defeats any argument that the Plaintiffs suffer an intangible injury if the withdrawal guidelines compel them to carry securities that are not of the kind they chose to invest.

The BP Plans decry the lost investment opportunities, but these damages are also easily calculable. After resolution on the merits, the Court could compare the BP Plans earnings on the 80% (or more, depending upon the liquidity of the collateral pool assets) of the assets that they received in cash to the earnings of the 20% (or less) of the assets from the collateral pool and compensate the Plaintiffs' for the lost investment opportunity. In other words, if the Plaintiffs receive $550 million of their investments in cash and $160 million in collateral pool assets, the Court could later determine the Plaintiffs earnings on that $550 million during the pendency of the trial and then determine how much more the Plaintiffs would have earned had they received the entire $710 million (presuming, of course, that the Court finds on the merits for the Plaintiffs). This calculation is not unlike those that award might award a plaintiff prejudgment interest to compensate for lost investment opportunity.

The BP Plans argue that there is a high probability of irreparable harm because this is an ERISA case. While ERISA does allow beneficiaries to seek injunctive relief to remedy fiduciary breaches, *see* 29 U.S.C. § 1132(a)(3), courts must make a case-by-case inquiry and not presume irreparable harm simply because a case involves an ERISA plan. *Gould v. Lambert Excavating, Inc.*, 870 F. 2d 1214, 1221 (7th Cir. 1989). The BP Plans argue briefly that the stability of the plan might be at stake, but they have offered no evidentiary support for this argument. Indeed, the withdrawal guidelines allow the BP Plans to make withdrawals in the ordinary course and the Plaintiffs presented no evidence to demonstrate that the individual pensioner needing to withdraw his or her pension, for whatever reason, is at risk.

9

The Court finds that the BP Plans' injuries are purely monetary and easily measured. The Plaintiffs have failed to make a clear showing that any injury they suffer cannot be remedied by a monetary damage award after trial or that monetary damages after the trial are a seriously deficient remedy. The Court therefore DENIES the Plaintiffs' request for a preliminary injunction.

IT IS SO ORDERED.

_12/16/08_
Dated

Hon. William J. Hibbler
United States District Court

10