**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BP CORPORATION NORTH AMERICA INC. SAVINGS PLAN INVESTMENT OVERSIGHT COMMITTEE serving in its capacity as a named fiduciary of the BP Employee Savings Plan, the BP Capital Accumulation Plan, the BP DirectSave Plan, the BP Employee Savings Plan of Puerto Rico, and the BP Partnership Savings Plan under the BP Master Trust for Employee Savings Plans and the BP Solar Employee Savings Plan under the Trust for the BP Solar Employee Savings Plan, and BP CORPORATION NORTH AMERICA INC. INVESTMENT COMMITTEE serving in its capacity as a named fiduciary of the BP Retirement Accumulation Plan and the Enstar Corporation Retirement Plan under the BP Master Trust for Employee Pension Plans, ) | Judge William J. Hibbler<br><br>Magistrate Judge Morton Denlow<br><br>CIVIL ACTION NO. 08-cv-6029 |
| Plaintiffs, ) | |
| v. ) | |
| NORTHERN TRUST INVESTMENTS, N.A. and THE NORTHERN TRUST COMPANY, ) | |
| Defendants. ) | |

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS TO PLAINTIFFS' AMENDED COMPLAINT**

Defendants Northern Trust Investments, N.A. ("NTI") and The Northern Trust Company ("NTC"), pursuant to Fed. R. Civ. P. 8(b), file the following Answer[1], Affirmative Defenses, and Counterclaims to Plaintiff's Amended Complaint in the above-captioned case. To the extent any allegations are not expressly admitted herein, they are hereby denied. Pursuant to Fed. R. Civ. P.

---

[1] No answer is required with respect to the headings, prayers for relief, and other contents of the Amended Complaint that do not set forth allegations of fact and are not included within numbered paragraphs as required by Fed. R. Civ. P. 10(b).

8(b), any statement as to which NTC and NTI lack knowledge or information sufficient to form a belief about the truth shall have the effect of a denial. NTC and NTI answer Plaintiffs' Amended Complaint as follows:

## Summary of the Action

1.     This is an action for equitable relief and damages under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq., and various Investment Manager Agreements between the Plan Committees and NTI. The Defendants, in violation of their fiduciary duties under ERISA, have engaged in investment activities, namely, a securities lending program, which involved inappropriate risk and led to inappropriate losses in NTI's investment funds offered through the savings plans and the pension plans identified above (hereinafter, collectively, "the Plans"). This action seeks preliminary injunctive relief ordering the immediate return of Plan assets to prevent further incalculable losses as a result of Defendants' negligent investment strategy based on a securities lending program. Further, this action seeks to recover, for the benefit of the Plaintiffs' Plans, plan assets wrongfully retained by Defendants, as well as damages and other relief related to Defendants' breaches of their fiduciary duties to the Plans.

**ANSWER TO PARAGRAPH 1:** NTC and NTI admit that plaintiffs purport to bring an action for equitable relief and damages pursuant to ERISA and various Investment Management Agreements. NTC and NTI deny the remaining allegations of this Paragraph.

2.     Defendants' acts and omissions, as hereinafter described, are breaches of

Investment Manager Agreements, and of fiduciary duties under § 404(a) of ERISA and are prohibited transactions which violate § 406 of ERISA, which entitle the Plan Committees, pursuant to § 502(a)(2) of ERISA, to recover appropriate relief under § 409 of ERISA and, pursuant to § 502(a)(3) of ERISA, to enjoin acts which violate ERISA and the Plans. *See* 29 U.S.C. §§ 1104(2), 1106, 1132(a)(2)-(3), 1109(2).

**ANSWER TO PARAGRAPH 2:** NTC and NTI deny the allegations of this Paragraph.


## The Parties

3.      Plaintiff BP Corporation North America Inc. Savings Plan Investment Oversight Committee serving in its capacity as a named fiduciary of the BP Employee Savings Plan, the BP Capital Accumulation Plan, the BP DirectSave Plan, the BP Employee Savings Plan of Puerto Rico, and the BP Partnership Savings Plan under the BP Master Trust for Employee Savings Plans and the BP Solar Employee Savings Plan under the Trust for the BP Solar Employee Savings Plan has discretionary authority for the investments of such trusts and is a fiduciary under ERISA. These savings plans are defined contribution plans which allow participants to direct how their contributions will be invested among various investment options.

**ANSWER TO PARAGRAPH 3:** Upon information and belief, NTC and NTI admit the first sentence of this Paragraph. NTC and NTI lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this Paragraph.


4.      Plaintiff BP Corporation North America Inc. Investment Committee serving in its capacity as a named fiduciary of the BP Retirement Accumulation Plan and the Enstar Corporation Retirement Plan under the BP Master Trust for Employee Pension Plans has

discretionary authority for the investments of such trusts and is a fiduciary under ERISA. These pension plans are defined benefit plans designed to provide retirement benefits for employees and their beneficiaries.

> **ANSWER TO PARAGRAPH 4:** Upon information and belief, NTC and NTI admit the first sentence of this Paragraph.  NTC and NTI lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this Paragraph.

5.      Defendant Northern Trust Investments, N.A. is an affiliate of Defendant The Northern Trust Company. Northern Trust Investments, N.A. is a national banking association with its principal place of business in Chicago, Illinois and is a fiduciary with respect to the Plans.

> **ANSWER TO PARAGRAPH 5:** NTC and NTI admit that Northern Trust Investments, N.A. is an affiliate of The Northern Trust Company and is a national banking association with its principal place of business in Chicago, Illinois.  To the extent this Paragraph purports to describe various agreements, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this Paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  NTC and NTI deny any remaining allegations of this Paragraph.

6.      Defendant The Northern Trust Company is an Illinois state banking corporation with its principal place of business in Chicago, Illinois. Directly and/or through its affiliates, The Northern Trust Company provides investment products, including the products provided by NTI to the Plans and is a fiduciary or a party in interest with respect to the Plans.

**ANSWER TO PARAGRAPH 6:**  NTC and NTI admit that The Northern Trust Company is an Illinois state banking corporation with its principal place of business in Chicago, Illinois.  To the extent this Paragraph purports to describe various agreements, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this Paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  The remaining allegations are vague and unintelligible, and, accordingly, NTC and NTI deny those allegations.

## Jurisdiction and Venue

7.      The Plan Committees seek relief on behalf of the Plans pursuant to the civil enforcement remedies provided by ERISA against fiduciaries pursuant to §§ 409 and 502(a) of ERISA (29 U.S.C. §§ 1109, 1132). This Court has jurisdiction over this action and the Defendants pursuant to 28 U.S.C. § 1331 and § 502(e)(1) and (2) of ERISA (29 U.S.C. § 1132(e)(1) and (2)). This Court has supplemental jurisdiction over the contract claims pursuant to 28 U.S.C. § 1367.

**ANSWER TO PARAGRAPH 7:** NTC and NTI admit that plaintiffs purport to seek relief pursuant to ERISA.  The Court has stricken the last sentence of this Paragraph, pursuant to its order of June 18, 2009, and thus no answer to that sentence is required. The remaining allegations in this Paragraph state legal conclusions as to which no answer is required.

8.      Venue of this action in the Northern District of Illinois is proper pursuant to

§ 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391, because Defendants' breaches took place in the district, and Defendants may be found in the district.

**ANSWER TO PARAGRAPH 8:** NTC and NTI admit that that they may be found in the Northern District of Illinois. NTC and NTI deny that they committed any breaches. The remaining allegations in Paragraph 8 state legal conclusions as to which no answer is required.

## Common Allegations

9.     The Savings Plan Committee and NTI are parties to an Investment Manager Agreement, dated as of January 1, 2008, regarding certain assets of the BP Solar Employee Savings Plan held in trust in the Trust for the BP Solar Employee Savings Plan ("the Solar IMA").

**ANSWER TO PARAGRAPH 9:** To the extent this Paragraph purports to describe the referenced Investment Manager Agreement, NTC and NTI refer to that document for its content and deny any allegations inconsistent therewith.

10.     BP Corporation North America Inc. (f/k/a BP Amoco Corporation), for the benefit of The Savings Plan Committee, and NTI are parties to an Investment Manager Agreement, pursuant to an Assignment and Assumption Agreement dated on or about November 25, 2002, regarding certain assets of the BP Employee Savings Plans held in trust in the BP Master Trust for Employee Savings Plans ("the Savings Plan IMA").

**ANSWER TO PARAGRAPH 10:** To the extent this Paragraph purports to describe the referenced Investment Manager Agreement and Assignment and Assumption Agreement,

NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.

11.     BP Corporation North America Inc., for the limited purposes described in the agreement, the Investment Committee of BP Corporation North America Inc. and NTI are parties to an Investment Manager Agreement, dated as of February 28, 2008, regarding certain assets of the BP Pension Plans held in the BP Master Trust for Employee Pension Plans ("the Pension Plan IMA"). (The Solar IMA, the Savings Plan IMA and the Pension Plan IMA are collectively referred to herein as "the IMAs." The Trust for the BP Solar Employee Savings Plan, the BP Master Trust for Employee Savings Plans, and the BP Master Trust for Employee Pension Plans are collectively referred to herein as the "BP Trusts".)

**ANSWER TO PARAGRAPH 11:** To the extent this Paragraph purports to describe the referenced agreements, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.  No answer is required to the definitions set forth in the last two sentences of this Paragraph.

12.     The assets of the BP Trusts managed by NTI pursuant to the IMAs are held by NTI in trust, and invested for the benefit of the BP Plans, in four collective investment funds established pursuant to a Declaration of Trust of the Northern Trust Global Investments Quantitative Management Collective Funds Trust ("the NTGI Trust"), effective as of January 31, 2006 (the "Collective Funds").

**ANSWER TO PARAGRAPH 12:** NTC and NTI admit that certain trust funds are established and maintained as part of the Northern Trust Global Investments Quantitative

Management Collective Funds Trust established by the referenced Declaration of Trust, and that certain assets of the "BP Trusts" are invested in certain of these trust funds. To the extent this Paragraph purports to describe the various referenced documents, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith. NTC and NTI deny any remaining allegations of this Paragraph.

13. Each of the four (4) Collective Funds in which the BP Plans' assets are invested ("the Index Funds") is managed by NTI and benchmarked to a different stock or bond index. For example, the Small Cap Equity Index Fund is benchmarked against the Russell 2000 Index. The three other Index Funds are benchmarked against the S&P 500 Index, the Lehman Brothers 1-to-3 year Government Bond Index, and the Lehman Brothers Aggregate Bond Index, respectively. The Index Funds have not been performing consistently with their respective benchmarks on account of losses related to NTI's securities lending activities. As a result of the losses NTI has incurred through its securities lending activities, among other reasons, the Savings Plans Committee halted any additional BP participant contributions to and transfers into the Index Funds as of October 15, 2008, and the Plan Committees demanded that NTI return the Plans' assets excluding the effects of the securities lending program so that they could be re-invested in funds that would not engage in securities lending.

**ANSWER TO PARAGRAPH 13:** NTC and NTI admit that NTI manages the NTGI-QM Collective Daily S&P 500 Equity Index Fund-Lending, the NTGI-QM Collective Daily Russell 2000 Index Fund-Lending, the NTGI-QM Collective Daily Aggregate Bond Index Fund-Lending, and the NTGI-QM Collective Daily Short Term Government Bond Index Fund-Lending (the "Lending Index Funds"); that such funds have as their objective the

provision of investment results that approximate the overall performance of the securities included in the indexes referenced in each fund's name; and refer to the Fund Declarations for their content, denying any allegations inconsistent therewith. NTC and NTI lack knowledge or information sufficient to form a belief about the truth of the allegations concerning plaintiffs' intent, and, accordingly, deny the last sentence and any remaining allegations in this Paragraph.

14.     Pursuant to the IMAs, NTI:

(A)     was appointed to be the "Investment Manager" of "Investment Accounts" identified by the Plans for investment by NTI, and NTI accepted such appointment;

(B)     acknowledged that the BP Trusts and the Investment Accounts were subject to the provisions of ERISA, and that NTI is a fiduciary, as defined in ERISA, with respect to the BP Trusts and the Investment Accounts;

(C)     agreed that its obligation to diversify the Investment Accounts was subject to the Investment Guidelines contained in the IMAs; and

(D)     agreed to notify the Plan Committees in writing in the event that the Investment Manager determined that there existed any actual or perceived conflict of interest which affected the Investment Accounts.

**ANSWER TO PARAGRAPH 14:** To the extent this Paragraph purports to describe various agreements, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this Paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.

15.     Pursuant to the Investment Guidelines reflected in the IMAs, NTI was authorized to lend securities from the Collective Funds, in which the Plans' assets were invested. NTI stated to the Plan Committees that the purpose of the securities lending program was to earn a return through investment of the cash collateral received from borrowers of securities, which

would allow: (a) NTI to offset its expenses under the IMAs and (b) the Index Funds to better match the performance of their respective benchmark indices. NTI appointed NTC as the securities lending agent for the Collective Funds and delegated to NTC the discretion to manage the securities lending activities.

**ANSWER TO PARAGRAPH 15:**  To the extent this Paragraph purports to describe various agreements, including the Declaration of Trust, investment management agreements, fund declarations, and the securities lending agreement, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this Paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  NTC and NTI admit that NTI was authorized to lend securities from the Lending Index Funds in which the BP Plans' assets are invested and that NTI as trustee appointed NTC as agent to lend securities of such funds pursuant to a securities lending authorization agreement.  The remaining allegations are vague and unintelligible, and, accordingly, NTC and NTI lack knowledge or information sufficient to form a belief about the truth of those allegations.


16.     Pursuant to the securities lending program, NTC, as agent, loaned securities purchased for the benefit of the Index Funds through the NTI-managed Collective Funds to borrowers who, in exchange, provided cash collateral as security for the return of the loaned securities. NTI then invested the cash collateral in at least two investment pools (the "Collateral Pools"), including a collective fund established under the NTGI Trust and managed by NTI. NTI shared in a monthly fee equal to a percentage of the net income earned by NTC through the securities lending; however, NTI does not share in any realized losses on the collateral

investments; the entire realized loss in the Collateral Pools is allocated pro rata to the relevant collective funds (and indirectly the Index Funds) and other investors in the Collateral Pools. The structure of the securities lending program was devised pursuant to a Securities Lending Authorization Agreement between NTI and NTC, which NTI entered into in its capacity as trustee for the NTGI Trust, but without properly disclosing the terms thereof to the Plans.

**ANSWER TO PARAGRAPH 16:** To the extent this Paragraph purports to describe various agreements such as the referenced securities lending authorization agreement, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this Paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required. Regarding the first three sentences of this Paragraph, NTC and NTI admit that certain securities of the Lending Index Funds were lent to certain borrowers who provided certain cash collateral as security for the return of the loaned securities; that NTC invested certain of that cash collateral in Core USA or in the STIF/STEP custom collateral fund; that NTC received a fee calculated as a percentage of certain securities lending revenue; and that realized credit losses incurred as a result of securities lending activities are not to be borne by NTC or NTI but by the lenders (including the Lending Index Funds). The allegations of NTI's sharing in revenues are vague and unintelligible, and, accordingly, NTC and NTI lack knowledge or information sufficient to form a belief about the truth of those allegations. NTC and NTI deny the last sentence and any remaining allegations of this Paragraph. Answering further, Northern Trust Corporation voluntarily contributed approximately $150 million in the aggregate to make up a portion of the collateral deficiency in five securities lending collateral pools, including in Core USA.

17.     Defendants operated the securities lending program in an imprudent manner without notice to the Plan Committees in that a high percentage of the securities in the Collective Funds (and indirectly the Index Funds) were loaned and the cash collateral for the loans was invested in Collateral Pools whose assets on the whole carried a higher aggregate risk due to their illiquidity than the aggregate risk carried by the Collective Funds (and indirectly the Index Funds) assets which were loaned.

**ANSWER TO PARAGRAPH 17:** NTC and NTI deny the allegations in this Paragraph.

18.     Certain of the investments in the Collateral Pools made with cash collateral received from securities borrowers: (a) have defaulted ("the Defaulted Securities"); and (b) have been marked down in value and/or, on information and belief, have become so illiquid that such investments only could be sold, if at all, substantially below the values at which they are carried by the Collateral Pools ("the Illiquid Securities"). (The Defaulted Securities and the Illiquid Securities are hereinafter referred to as "the Impaired Securities.") As a result, NTI has: (a) booked a loss to the Collective Funds (and indirectly the Index Funds) reflecting their share of the loss attributable to the Defaulted Securities, (b) allocated the Defaulted Securities to a liquidating trust and assigned to the Collective Funds (and indirectly the Index Funds) interests in the liquidating trust; and (c) issued an account payable from the Collective Funds (and indirectly the Index Funds) whose cash collateral was invested in a Collateral Pool named "Core USA," reflecting the reduced value at which certain Illiquid Securities are being held on the records of the relevant Core USA Collateral Pool. On information and belief, the Collective Funds (and indirectly the Index Funds) are at significant risk of incurring additional losses

resulting from (i) additional defaults of securities held in the Collateral Pools, (ii) additional declines in the value of securities held in the Collateral Pools and (iii) the realization of losses upon the sale of Illiquid Securities held in the Collateral Pools necessitated by the repayment of securities loans.

**ANSWER TO PARAGRAPH 18:** NTC and NTI admit that due to the condition of the market for debt securities, certain securities in the Core USA collateral pool or the STIF/STEP custom collateral fund are sufficiently illiquid that to sell them under duress into this market would yield a price below par, and further admit that certain of these securities have defaulted and are permanently impaired. NTC and NTI admit that certain permanently-impaired holdings have been segregated into a sub-fund, which is posted as an asset and a liability on the books of the Lending Index Funds using Core USA for investment of cash collateral. NTC and NTI further admit that the amount of the declared collateral deficiency attributable to certain of the funds using Core USA for investment of cash collateral was debited as a payable on the books of such funds. The remaining allegations of this Paragraph are vague and unintelligible, and, accordingly, NTC and NTI lack knowledge or information sufficient to form a belief about the truth of those allegations.

19.     Given the losses incurred by the Plans as a result of Defendants' investment of cash collateral received from securities borrowers, the risk of additional losses, and other reasons, the Plan Committees have requested withdrawal from the NTGI Trust of all amounts reflecting the Plans' interests in the Index Funds. The Plan Committees have further requested, pursuant to their rights under their respective IMAs, that the distribution of the Plans' assets be in cash or in-kind

securities matching the IMAs' Investment Guidelines in an amount reflecting the value of the Investment Accounts, excluding any effects of securities lending or investment in cash collateral pools or funds supporting securities lending.

> **ANSWER TO PARAGRAPH 19:** Regarding the first sentence of this Paragraph, NTC and NTI deny that anything they did resulted in losses to the "Plans." NTC and NTI lack knowledge or information sufficient to form a belief about the truth of the allegations concerning the reasons for any action by the "Plan Committees." NTC and NTI deny the remaining allegations in this Paragraph.

20.     NTI has refused to distribute the Plans' assets in cash in a full withdrawal, and, instead, informed the Plan Committees that NTI's distribution would include interests in the Impaired Securities, and, thus, would not give the Plans only cash and the in-kind securities in which the Plans' assets were to be invested under the applicable Investment Guidelines of the IMAs. Accordingly, NTI's distribution would provide the Plans with interests in a substantial amount of securities from the Collateral Pools, including interests in the Impaired Securities which are not part of the relevant indices specified in the Investment Guidelines. NTI's distribution would cause further incalculable losses to the Plans because, among other reasons, the Impaired Securities NTI would provide are, on information and belief, illiquid or nearly so. Even if they could be sold in this economic environment so that the Plans could purchase new securities which fall within the Investment Guidelines of the IMAs, the Plans likely would take substantial losses from the carrying book-value NTI has assigned these assets.

> **ANSWER TO PARAGRAPH 20:** NTC and NTI deny the allegations in this Paragraph.

### ERISA Requirements

21.     Section 404(a)(1) of ERISA provides, in pertinent part, that

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
> (A) for the exclusive purpose of:
>> (i) providing benefits to participants and their beneficiaries; and
>> (ii) defraying reasonable expenses of administering the plan;
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.

**ANSWER TO PARAGRAPH 21:** The allegations of this Paragraph state legal conclusions as to which no answer is required.


22.     Section 406(b)(1) of ERISA, 29 U.S.C. § 1 106(b)(1), provides, in pertinent part, that

> (b)     Transactions between plan and fiduciary
> A fiduciary with respect to a plan shall not—
> (1)     deal with the assets of the plan in his own interest or for his own account, . . . .

Section 409(a) of ERISA, 29 U.S.C. § 1109(a), titled "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

15

**ANSWER TO PARAGRAPH 22:** The allegations of this Paragraph state legal conclusions as to which no answer is required.

## Defendants' Fiduciary Status

23.     Through their conduct, and under ERISA, each of the Defendants is a fiduciary with respect to the Plans and owed, and continues to owe, fiduciary duties to the Plans and their participants under ERISA in the manner and to the extent set forth in the Plans' documents. NTI is liable under the IMAs for any acts or omissions of NTC under the authority which NTI delegated to NTC.  NTC and NTI deny the remaining allegations in this Paragraph.

**ANSWER TO PARAGRAPH 23:** To the extent this Paragraph purports to describe various agreements, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this Paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.

24.     As fiduciaries, Defendants were required by § 404(a)(1) of ERISA, 29 U.S.C. § 11 04(a)( 1), to manage the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

**ANSWER TO PARAGRAPH 24:** To the extent this Paragraph purports to describe various agreements, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this Paragraph purports to describe the

legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.

## Count I
## (Failure to Distribute Plans' Interests in the NTGI Trust in
## Cash or in Kind)

25.     The Plan Committees restate and incorporate the allegations contained in each paragraph above as though fully set forth herein.

**ANSWER TO PARAGRAPH 25:**  NTC and NTI repeat and reallege their answers to each paragraph above as their answer to this Paragraph as fully set forth herein.

26.     NTI agreed: pursuant to Section 12 of the IMAs, to return the Plans' assets in the Investment Accounts upon the Plan Committees' request as soon as practicable; pursuant to Section 20 of the IMAs, to notify the Plan Committees of a conflict of interest and the measures taken to eliminate such conflict; pursuant to Section 19 of the IMAs, to indemnify the Plans for breach of such obligations; and, pursuant to Section 2.03(c) of the NTGI Trust, in the exercise of its discretion in light of its fiduciary duties under the circumstances, to distribute the Plans' interests in the NTGI Trust in cash or in-kind securities, excluding any effects of securities lending or investment in cash collateral pools or funds supporting securities lending.

**ANSWER TO PARAGRAPH 26:**  To the extent this Paragraph purports to describe various agreements, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this Paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  NTC and NTI deny the remaining allegations of this Paragraph.

27.     NTI agreed, pursuant to Section 3(a) of the IMAs, not to enter into any transaction not authorized by their respective Investment Guidelines (*e.g.,* by excessive participation in a securities lending program and the investment of collateral from the program in securities which were inappropriate under the Investment Guidelines) in a manner which caused the Investment Accounts not to achieve their respective investment objectives and, pursuant to Section 19 of the IMAs, to indemnify the Plans for breach of such obligation.

> **ANSWER TO PARAGRAPH 27:**  To the extent this Paragraph purports to describe various agreements, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this Paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  NTC and NTI deny the remaining allegations of this Paragraph.

28.     NTI's return of the Plans' interests in the NTGI Trust, in response to the Plan Committees' exercise of their contractual rights to demand return of the assets, partially in cash, partially in kind, and partially by distribution of other assets including the Impaired Securities, would constitute a breach of Sections 12 and 20 of the IMAs and Section 2.03 of the NTGI Trust (*i.e.,* the failure to return the Plans' assets in cash or in kind). Pursuant to § 404(a)(1) of ERISA, NTI's plan of distribution also constitutes a breach of NTI's fiduciary duties, including, without limitation, its duty of loyalty, in that NTI's actions are designed to shift to the Plans the losses, and the risk of future losses, caused by, among other things, Defendants' negligent operation of the securities lending program rather than to return to the Plans assets reflecting the value of the

Investment Accounts excluding any effects of securities lending or investment in Collateral Pools.

**ANSWER TO PARAGRAPH 28:** NTC and NTI deny the allegations of this Paragraph.

29. As a result of the Defendants' past and continuing breaches of their fiduciary duties and the IMAs, the Plan Committees, as fiduciaries of the Plans, are obligated to act to prevent Defendants' continuing breaches of their fiduciary duties and the IMAs. The interests of participants in the Plans have been and will continue to be substantially and irreparably injured by Defendants' acts alleged herein. The Plans have incurred substantial losses as a result of such acts. The Plans are highly likely to continue to incur substantial losses which will be difficult, if not impossible, to calculate with precision. The rights of Plan participants to make and execute investment decisions regarding their interests in the Plans may be jeopardized. The Plan Committees have no remedy at law as full, complete and efficient to the ends of justice as preliminary and permanent injunctive relief to restrain such improper actions by Defendants, namely, the form of distribution of the Plans' assets from the NTGI Trust presented by Defendants, which would include the Impaired Securities. Rather, Defendants should be ordered to distribute to the Plans in cash or in kind (*i.e.,* securities which meet the investment profiles in the Investment Guidelines for the appropriate Index Funds), as soon as possible but in no event later than the deadline set forth in the IMAs, in such amounts as reflect the performance which the Index Funds would have achieved excluding any effects of securities lending or investment in cash collateral funds from the date the Plan Committees made their withdrawal demand to the date the cash or in-kind securities are returned to the Plans upon entry of judgment.

**ANSWER TO PARAGRAPH 29:** NTC and NTI deny the allegations of this Paragraph.

## Count II
## (Imprudent Lending of Securities)

30.     The Plan Committees restate and incorporate the allegations contained in each paragraph above as though fully set forth herein.

**ANSWER TO PARAGRAPH 30:**  NTC and NTI repeat and reallege their answers to each paragraph above as their answer to this Paragraph as fully set forth herein.

31.     Pursuant to Section 3(a) of the IMAs, NTI agreed not to enter into any transaction not authorized by the Investment Guidelines which caused the Investment Accounts not to achieve their respective investment objectives and, pursuant to Section 19 of the IMAs, to indemnify the Plans for breach of such obligation. NTI violated its obligations by, among other things, (a) engaging in and maintaining excessive securities lending from the Collective Funds, (b) lending the NTGI Trust's securities to some of the same borrowers whose securities were purchased for the Collateral Pools, and (c) failing to implement adequate risk monitoring procedures and guidelines to prevent capital losses in the Collateral Pools.

**ANSWER TO PARAGRAPH 31:**  To the extent that the first sentence of this Paragraph purports to describe various agreements, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent the first sentence of this Paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  NTC and NTI deny the remaining allegations of this Paragraph.

32. NTI's failure to limit the NTGI Trust's participation in securities lending despite the Plan Committees' requests that NTI do so, and its refusal to restrict such participation in the

future, despite (a) the previously undisclosed risks that NTI could not distribute the Plans' assets in cash or in-kind upon the Plan Committees' withdrawal of the Plans' assets under the IMAs, and (b) the inherent risks of loss associated with the NTGI Trust's aggressive securities lending activities, including lending the NTGI Trust's securities to some of the same borrowers from whom securities were purchased for the Collateral Pools, constitute breaches of Section 3(a) of the IMAs and, pursuant to § 404(a)(1) of ERISA, a breach of NTI's fiduciary duties, including, without limitation, the duties of loyalty and prudence, in that NTI's actions were designed to increase the revenues earned on securities lending, and the amount of such revenues retained by NTI or its affiliates, in negligent disregard of the risk of capital losses to the Plans. The Plans suffered such capital losses because, among other reasons, NTI engaged in such a high level of securities lending for certain Collective Funds (and indirectly the Index Funds) and negligently loaned the Collective Funds' securities to borrowers who also were debtors of the Collateral Pools. NTI's actions have caused the Plans to suffer substantial losses on their interests in the NTGI Trust for which Defendants are obligated to indemnify the Plans under the IMAs and, under § 502(a) (2) of ERISA, to restore to the Plans the assets lost due to Defendants' breaches.

**ANSWER TO PARAGRAPH 32:**  NTC and NTI deny the allegations of this Paragraph.


## Count III
### (Imprudent Investment of Collateral Provided by Securities Borrowers)

33.     The Plan Committees restate and incorporate the allegations contained in each paragraph above as though fully set forth herein.

**ANSWER TO PARAGRAPH 33:**  NTC and NTI repeat and reallege their answers to each paragraph above as their answer to this Paragraph as fully set forth herein.

34.     Pursuant to Section 3(a) of the IMAs, NTI agreed not to enter into any transaction not authorized by the Investment Guidelines in a manner which caused the Investment Accounts not to achieve their respective investment objectives and, pursuant to Section 19 of the IMAs, to indemnify the Plans for breach of such obligation. NTI violated its obligations by, among other things, investing in securities for the Collateral Pools which were inappropriate investments in light of the Investment Guidelines under the IMAs.

**ANSWER TO PARAGRAPH 34:**  To the extent that the first sentence of this Paragraph purports to describe various agreements, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent the first sentence of this Paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  NTC and NTI deny the remaining allegations of this Paragraph.

35.     NTI's failure to invest the collateral provided by securities borrowers in a prudent manner, despite the inherent risks of loss associated with its collateral investments, constitutes a breach of Section 3(a) of the IMAs and, pursuant to § 404(a)(1) of ERISA, a breach of NTI's fiduciary duties, including, without limitation, the duties of loyalty and prudence, in that NTI's actions were designed to increase the revenues earned on securities lending, and the amount of such revenues retained by NTI or its affiliates, in negligent disregard of the risk of capital losses to the Plans caused by NTI's negligent investment of collateral in inappropriate securities, which breaches have caused the Plans to suffer substantial losses, and the risk of future losses, on their interests in Defaulted Securities and Illiquid Securities for which Defendants are obligated to

indemnify the Plans under the IMAs and, under § 502(a)(2) of ERISA, to restore to the Plans the assets lost due to Defendants' breaches.

**ANSWER TO PARAGRAPH 35:** NTC and NTI deny the allegations of this Paragraph.

## Count IV
### (Inadequate and Untimely Disclosure of Losses in the Securities Lending Program)

36.     The Plan Committees restate and incorporate the allegations contained in each paragraph above as though fully set forth herein.

**ANSWER TO PARAGRAPH 36:** NTC and NTI repeat and reallege their answers to each paragraph above as their answer to this Paragraph as fully set forth herein.

37.     NTI's failure to notify the Plan Committees of the existence and the severity of losses in the Collateral Pools under NTI's securities lending program until at least five (5) months after NTI became aware of the likelihood of severe losses, and NTI's repeated failures to provide information requested by the Plan Committees about the status of the securities lending program, including, without limitation, the value of the Collective Funds' (and indirectly the Index Funds') securities being lent, constitutes, pursuant to § 404(a)(1) of ERISA, a breach of NTI's fiduciary duties, including without limitation, the duties of loyalty and diligence, such that the Plan Committees were deprived of timely and complete information which would have enabled the Plan Committees to take action to reduce the effects of NTI's negligent operation of the securities lending program before additional losses were incurred. Defendants' breaches have caused the Plans to suffer substantial losses on their interests in the NTGI Trust, and the risk of future losses, for which Defendants are obligated under § 502(a)(2) of ERISA, to restore to the Plans the assets lost due to Defendants' breaches.

**ANSWER TO PARAGRAPH 37:**  NTC and NTI deny the allegations of this Paragraph.

### Count V
### (Failure to Disclose NTI's Conflict of Interest Due to Excessive
### Lending of Securities)

38.     The Plan Committees restate and incorporate the allegations contained in each paragraph above as though fully set forth herein.

**ANSWER TO PARAGRAPH 38:**  NTC and NTI repeat and reallege their answers to each paragraph above as their answer to this Paragraph as fully set forth herein.

39.     Pursuant to Section 20 of the IMAs, NTI agreed to notify the Plan Committees of any conflict of interest and the measures taken to eliminate such conflict; and, pursuant to Section 19 of the agreements, to indemnify the Plans for breach of such obligations.

**ANSWER TO PARAGRAPH 39:** To the extent this Paragraph purports to describe various agreements, NTC and NTI refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this Paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required.  NTC and NTI deny the remaining allegations of this Paragraph.

40.     NTI failed to notify the Plan Committees of the extent of NTI's self-interest in expanding and maintaining the securities lending program to generate increased revenue for NTI, and to shore up the capital of other NTI-managed funds in order to attract new investors and retain current investors, because NTI only reported the high volume of securities lending once each year, or of the increased credit risk of the securities in which the collateral received from

the borrowers of securities was invested. This failure to notify constitutes a breach of Section 20

of the IMAs and, pursuant to § 404(a)(1) of ERISA, a breach of NTI's fiduciary duties, including

without limitation, the duties of loyalty and prudence, in that NTI's actions increased the revenue

which NTI or its affiliates received from the lending of securities based on the net income earned

on the securities in which the collateral was invested, at no risk to NTI, but with increased risk of

losses to the Plans' interests in the NTGI Trust. Defendants' breaches have caused the Plans to

suffer substantial losses, and the risk of future losses, on their interests in the NTGI Trust for

which Defendants are obligated to indemnify the Plans under the IMAs and, under § 502(a)(2) of

ERISA, to restore to the Plans the assets lost due to Defendants' breaches. The NT Defendants

now face an inherent conflict of interest: *either* permit the Plans to fully withdraw as is their

right and absorb potential losses in NTI's other funds caused by effecting the Plans' withdrawal

*or* attempt to transfer losses from those other funds to the Plans for the benefit of other investors

in those other funds.

**ANSWER TO PARAGRAPH 40:** NTC and NTI deny the allegations of this Paragraph.


## Count VI
### (Engaging In ERISA-Prohibited Transactions)

41.     The Plan Committees restate and incorporate the allegations contained in each

paragraph above as though fully set forth herein.

**ANSWER TO PARAGRAPH 41:**  NTC and NTI repeat and reallege their answers to

each paragraph above as their answer to this Paragraph as fully set forth herein.


42.     The NT Defendants' failure to terminate the Plans' interests in securities loans

and return cash or Index Fund securities to the Plans upon demand violates ERISA's prohibition

against certain transactions. *See* 29 U.S.C. § 1106.

**ANSWER TO PARAGRAPH 42:** NTC and NTI deny the allegations of this Paragraph.

43.    Section 406(b)(1) of ERISA prohibits a fiduciary, such as NTI, from "deal[ing] with the assets of the plan in his own interest or for his own account . . . ." 29 U.S.C. § 1 106(b)(1). The NT Defendants have done just that by lending the Collective Funds' securities for the NT Defendants' benefit by taking 40% of any profits earned on those loans.

**ANSWER TO PARAGRAPH 43:** The first sentence of this Paragraph states legal conclusions as to which no answer is required.  NTC and NTI deny the remaining allegations of this Paragraph.

44.    Section 408(a) of ERISA, 29 U.S.C. § 1108(a), permits the Secretary of Labor to grant exemptions to this prohibition, which the Secretary of Labor has established for securities lending agreements. *See* Prohibited Transaction Exemption ("PTE") 2006-16, Section I(c), 71 Fed. Reg. 63786. But because the NT Defendants failed to comply with the exemption's requirements, the NT Defendants are liable for engaging in prohibited transactions.

**ANSWER TO PARAGRAPH 44:** The first two sentences of this Paragraph state legal conclusions and citations as to which no answer is required.  NTC and NTI deny the last sentence and any remaining allegations of this Paragraph.

45.    Section I(c) of PTE 2006-16 provides, in part, that the "restrictions of section 406(b)(1) of ERISA . . . shall not apply to the payment to a fiduciary (the Lending Fiduciary) of compensation for services rendered in connection with loans of plan assets that are securities,

*provided that the conditions set forth in section IV below are met."* 71 Fed. Reg. 63796. (Emphasis added.) In turn, Section IV(d)(1) requires "prior written authorization of a plan fiduciary . . . independent of the Lending Fiduciary and any affiliate thereof . . . ." Further, Section IV(d)(2) requires, among other things, that the compensation to the Lending Fiduciary may be terminated "by the authorizing fiduciary" (here, the Plan Committees) within the lesser of the time negotiated by the parties *or* five days. 71 Fed. 63797.

**ANSWER TO PARAGRAPH 45:** The allegations of this Paragraph state legal conclusions as to which no answer is required.


46.    Under PTE 2006-16, Section IV(e), the Authorizing Fiduciary cannot provide authorization of the compensation arrangement unless the Lending Fiduciary has furnished the Authorizing Fiduciary with any reasonably available information which the Lending Fiduciary reasonably believes to be necessary to determine whether such authorization should be made or renewed, and any other reasonably available information regarding the matter that the Authorizing Fiduciary may reasonably request. 71 Fed. Reg. at 63797.

**ANSWER TO PARAGRAPH 46:** The allegations of this Paragraph state legal conclusions as to which no answer is required.


47.    Under PTE 2006-16, Section IV(f)(1), subsection (d) does not apply to collective trust funds, but only if the Lending Fiduciary has provided any reasonably available information which the Lending Fiduciary reasonably believes to be necessary to determine whether such authorization should be made or renewed, and any other reasonably available information regarding the matter that the Authorizing Fiduciary may reasonably request, to the Authorizing

Fiduciary of each plan whose assets are invested in the collective fund, not less than 30 days prior to the implementation of the arrangement, and upon the reasonable request of the Authorizing Fiduciary. 71 Fed. Reg. at 63797.

**ANSWER TO PARAGRAPH 47:** The allegations of this Paragraph state legal conclusions as to which no answer is required.

48.     Under PTE 2006-16, Section IV(f)(3), if the Lending Fiduciary fails to provide the information requested by the Authorizing Fiduciary in the manner described in subsection (f)(1), the plan's investment in the collective fund will be governed by subsection (d)(1). 71 Fed. Reg. at 63798.

**ANSWER TO PARAGRAPH 48:** The allegations of this Paragraph state legal conclusions as to which no answer is required.

49.     NTI, as trustee of the NTGI Trust, entered into a certain Securities Lending Authorization Agreement, dated August 1, 2006 ("SLAA"), with NTC.

**ANSWER TO PARAGRAPH 49:** NTC and NTI admit that NTI and NTC entered into a certain Securities Lending Authorization Agreement; refer to that agreement for its contents; and deny any allegations inconsistent therewith.

50.     NTI, on behalf of the Collective Funds, and indirectly on behalf of the Index Funds, agreed to appoint NTC as NTI's agent to loan the Collective Funds' securities pursuant to the Securities Lending Authorization Agreement.

**ANSWER TO PARAGRAPH 50.**  To the extent this Paragraph purports to describe the referenced Securities Lending Authorization Agreement, NTC and NTI refer to that document for its contents and deny any allegations inconsistent therewith.  To the extent this Paragraph purports to describe the legal effect of that agreement or of applicable legal principles, no answer to such legal conclusions is required.  NTC and NTI lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this Paragraph.

51.  The Securities Lending Authorization Agreement provided that NTI, as trustee of the NTGI Trust, acted on behalf of the Collective Funds to appoint NTC as an agent to lend securities from one or more of the Collective Funds to third-party borrowers.

**ANSWER TO PARAGRAPH 51.**  To the extent this Paragraph purports to describe the referenced Securities Lending Authorization Agreement, NTC and NTI refer to that document for its content and deny any allegations inconsistent therewith.  To the extent this Paragraph purports to describe the legal effect of that agreement or of applicable legal principles, no answer to such legal conclusions is required.

52.  The NT Defendants failed to provide the SLAA to the Plan Committees before authorizing NTC to act as the securities lending agent, and the NT Defendants continued to withhold the SLAA even after multiple requests from the Plan Committees.

**ANSWER TO PARAGRAPH 52.**  NTC and NTI deny the allegations of this Paragraph.

53.  The Plan Committees requested a copy of the SLAA from NTI on numerous

occasions from at least as early as April 2008 to October 2008, but were told by NTI that NTI's Legal Department would not authorize delivery to the Plan Committees of a copy of the SLAA. The Plan Committees finally received a copy of the SLAA on or about October 8, 2008, after the Plans had incurred heavy losses.

**ANSWER TO PARAGRAPH 53.**  NTC and NTI admit that plaintiffs received a copy of the SLAA on or about October 8, 2008 and deny the remaining allegations of this Paragraph.

54.     By failing to get prior written authorization for the securities lending compensation arrangement from the Plan Committees, and failing to provide a copy of the SLAA to the Plan Committees at least 30 days prior to the implementation of the arrangement or after repeated requests, the NT Defendants have failed to comply with subsections IV (d) and (f) of PTE 2006-16.

**ANSWER TO PARAGRAPH 54.**  NTC and NTI deny the allegations of this Paragraph.

55.     Because the NT Defendants failed to comply with PTE 2006-16, their operation of the securities lending program for the Plans was unauthorized and a per se violation of § 406(b)(1) of ERISA. 29 U.S.C. § 1106.

**ANSWER TO PARAGRAPH 55.**  NTC and NTI deny the allegations of this Paragraph.

56.     The NT Defendants have refused to allow the Plan Committees to withdraw from their indirect participation in securities lending with the Index Funds' assets within 5 days, in violation of PTE 2006-16, Section IV(d)(2)(ii).

**ANSWER TO PARAGRAPH 56.**  NTC and NTI deny the allegations of this Paragraph.

57.     Thus, the NT Defendants continue to deal with the Plans' assets for their own profit without the necessary authorization from the Plan Committees in violation of Section IV of PTE 2006-16. Moreover, upon information and belief, the NT Defendants are using the Plans' assets not only for their own profit, but to shore up the liquidity of the Collateral Pools. The NT Defendants are using that liquidity to process so-called "ordinary course" transactions of other investors in the Collateral Pools, thereby using the Plans' assets to fulfill their responsibilities to their other investors and potentially limit their liability to those other investors. Nothing in PTE 2006-16 permits the NT Defendants to commandeer the Plans' assets for their own use in this way. To the contrary, such an act is a textbook example of "deal[ing] with assets of the plan in his own interest" in direct violation of § 406(b)(1) of ERISA.

**ANSWER TO PARAGRAPH 57.**  NTC and NTI deny the allegations of this Paragraph.

58.     The NT Defendants' violations of Section 406 of ERISA have caused the Plans to suffer substantial losses, and the risk of future losses, on account of their interests in the Collateral Pools' investments. Their continuing violation must be enjoined pursuant to § 502(a) of ERISA, 29 U.S.C. § 1132(a), and any damages incurred must be restored pursuant to § 409 of ERISA, 29 U.S.C. § 1109.

**ANSWER TO PARAGRAPH 58.**  NTC and NTI deny the allegations of this Paragraph.

## <u>REQUEST FOR RELIEF</u>

Wherefore, the Plaintiffs demand judgment against Defendants NORTHERN TRUST INVESTMENTS, N.A. and THE NORTHERN TRUST COMPANY, jointly and severally, for the following relief:

(A)     Find and declare that Defendants have breached the Investment Manager Agreements, the NTGI Trust and their fiduciary duties under ERISA as described above;

(B)     Find and declare that Defendants have engaged in a prohibited transaction in violation of § 406 of ERISA by their operation of a securities lending program with the securities held in the Index Funds;

(C)     Pursuant to § 502(a)(3) of ERISA, injunctive relief as set forth above;

(D)     Pursuant to §§ 409(a) and 502(a)(2) of ERISA, disgorgement/restitution and/or damages as set forth above, and all other remedial relief as the Court may deem appropriate;

(E)     Pursuant to § 502(g) of ERISA, reasonable attorneys' fees and costs;

(F)     Payment to the Plans of such damages as the Plans sustained as a result of Defendants' breaches of the Investment Manager Agreements, including losses to the Plans resulting from imprudent investment of the Plans' assets; to restore to the Plans all profits the Defendants made through use of the Plans' assets; and to restore to the Plans all profits which the Plans' participants would have made if Defendants had performed their obligations under the Investment Manager Agreements;

(G)     Pre-judgment and post-judgment interest at the maximum allowable rates; and

(H)     All such other and further relief, general or special, legal or equitable, to which the Plaintiffs may be entitled.

Plaintiffs hereby request a trial by jury.

**ANSWER TO "REQUEST FOR RELIEF" AND DEMAND FOR JURY TRIAL.**

NTC and NTI deny that the Plan Committees are entitled to any of these purported "requests for relief." NTC and NTI further deny that they committed any wrongdoing under ERISA or under any other law or that they violated the terms of any agreements. NTC and NTI deny any

remaining allegations in this "request for relief." NTC and NTI deny that plaintiffs are entitled to a jury trial, and state further than the demand for a jury trial should be stricken.

## AFFIRMATIVE DEFENSES

NTC and NTI allege the following affirmative defenses with respect to the claims alleged in the Amended Complaint without assuming the burden of proof where the burden of proof rests upon the plaintiffs.

1. The Amended Complaint fails to state a claim upon which relief may be granted.

2. The Plan Committees' non-ERISA and/or state law claims are preempted under ERISA and should be, and have been, dismissed from this action.

3. NTC and NTI at all times acted reasonably and prudently and fulfilled all of their legal and other duties.

4. The Plan Committees did not rely on NTC and NTI in making investment decisions or in taking any action referenced in this Amended Complaint.

5. The BP Plans have sustained no damages.

6. No act or omission of NTC and NTI caused the BP Plans to sustain any injury.

7. If the BP Plans sustained any injury—which NTC and NTI specifically deny—any such injury was due, in whole or in part, to actions and/or omissions by the Plan Committees.

8. If the BP Plans sustained any damages—which NTC and NTI specifically deny—then the BP Plans failed to mitigate such damages and their claim for damages should be barred or reduced accordingly.

9.      If NTC or NTI violated fiduciary or other duties to the BP Plans—which NTC and NTI specifically deny—then the Plan Committees also violated fiduciary and other duties to the BP Plans and are liable for their share of any plan losses caused by their misconduct.

10.     If NTC and NTI violated fiduciary or other duties to the BP Plans—which NTC and NTI specifically deny—then the Plan Committees also violated fiduciary and other duties to the BP Plans and, since the violations by the Plan Committees were active and greater in severity and scope than any such violations by NTC and NTI, the Plan Committees are liable for all of the BP Plans' alleged losses.

11.     The BP Plans' claims are deficient by virtue of the operation of Articles 2.03, 3.02, and 5.02 of the Declaration of Trust.

12.     Plaintiffs ratified the allegedly improper or unlawful acts of NTC and NTI alleged in the Amended Complaint.

13.     Plaintiffs acquiesced in the allegedly improper or unlawful acts of NTC and NTI alleged in the Amended Complaint.

14.     Plaintiffs assumed the risk of the allegedly improper or unlawful acts of NTC and NTI alleged in the Amended Complaint.

15.     Plaintiffs are estopped from seeking or obtaining any relief due to the allegedly improper or unlawful acts of NTC and NTI alleged in the Amended Complaint.

16.     Plaintiffs have waived seeking or obtaining any relief due to the allegedly improper or unlawful acts of NTC and NTI alleged in the Amended Complaint.

17.     Plaintiffs' claims are barred, in whole or in part, by the statute of limitations.

18.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

19.     Plaintiffs' own unclean hands prevent them from obtaining any relief from NTC and NTI on behalf of the BP Plans.

20.     Plaintiffs' own "in pari delicto" conduct prevents them from obtaining any relief from NTC and NTI on behalf of the BP Plans.

21.     The Plan Committees improperly and fraudulently induced NTI to enter into the IMAs.

22.     The Plan Committees have not substantially performed under or pursuant to the referenced IMAs.

23.     Plaintiffs' damages, if any, are limited by the express terms of the IMAs.

24.     If NTC and NTI engaged in any "prohibited transaction"—which they deny—then plaintiffs participated and acquiesced in, ratified, and waived any rights regarding such alleged prohibited transactions.

## COUNTERCLAIMS

Defendants/Counterclaim-plaintiffs The Northern Trust Company ("NTC") and Northern Trust Investments, N.A. ("NTI") bring the following counterclaims for Contribution and Indemnification against Plaintiffs/Counterclaim-defendants The BP Corporation North America Inc. Savings Plan Investment Oversight Committee (the "SPIOC") and the BP Corporation North America Inc. Investment Committee (the "Investment Committee").

## Jurisdiction and Venue

1.     This Court has subject matter jurisdiction over these counterclaims under both 28 U.S.C. § 1331 and §502(e)(1)-(2) of ERISA, 29 U.S. C. § 1132(e)(1)-(2).

2.     Venue over these counterclaims is proper in the Northern District of Illinois because a substantial number of the Counterclaim-defendants' actions giving rise to the counterclaims asserted herein occurred in this district.

## Factual Background

## The Plan Committees are Responsible for the BP Plans' Investments.

3.     Upon information and belief, the SPIOC serves as a named fiduciary of the BP Employee Savings Plan, the BP Capital Accumulation Plan, the BP DirectSave Plan, the BP Employee Savings Plan of Puerto Rico, and the BP Partnership Savings Plan under the BP Master Trust for Employee Savings Plans, and the BP Solar Employee Savings Plan under the Trust for the BP Solar Employee Savings Plan (together, the "Savings Plans"). In that capacity, the SPIOC has overall authority and control over the investment of assets of the Savings Plans. The SPIOC has discretionary authority for the investments of the Savings Plans and is a fiduciary under ERISA.

4.     Upon information and belief, the Investment Committee serves as a named fiduciary of the BP Retirement Accumulation Plan and the Enstar Corporation Retirement Plan under the BP Master Trust for Employee Pension Plans (jointly, the "Pension Plans"). In that capacity, the Investment Committee has overall authority and control over the investment of assets of the Pension Plans. The Investment Committee has discretionary authority for the investments of the Pension Plans and is a fiduciary under ERISA.

5.     Among other responsibilities, the SPIOC and the Investment Committee (jointly, "the Plan Committees") are responsible for selecting and retaining investment managers and establishing investment guidelines applicable to such investment managers. The Plan

Committees are responsible for monitoring the continuing appropriateness of each investment manager selection and making sure that each investment manager is meeting its investment objectives and fulfilling its responsibilities pursuant to applicable law and contractual arrangements. The Plan Committees are responsible for determining which portion of the assets of the Savings Plans and Pension Plans (together, the "BP Plans") should be allocated to each investment manager; establishing appropriate investment guidelines, directions, and limitations applicable to each such manager; and monitoring the continued appropriateness of such decisions.

6.      The Plan Committees also have overall discretionary authority and control over the investments of the BP Plans under ERISA, including the selection of investment options for the BP Plans and the investment of BP Plan assets.

7.      The Plan Committees have a fiduciary responsibility for conducting appropriate investigations and due diligence in connection with each of the foregoing responsibilities. The Investment Committee has a duty to perform necessary and prudent due diligence, and to conduct a necessary and prudent investigation, in connection with and prior to investing assets of the Pension Plans. The SPIOC has a duty to perform necessary and prudent due diligence, and to conduct a necessary and prudent investigation, in connection with and prior to selecting investment options for the investment of assets of the Savings Plans. The Plan Committees have a duty to perform necessary and prudent due diligence, and to conduct a necessary and prudent investigation, in connection with and prior to selecting investment managers and in connection with monitoring the conduct of such managers.

### The Plan Committees Directed the Investment of Plan Assets.

8.　　Under ERISA and the trust agreements establishing the BP Plans, the Plan Committees may appoint investment managers to manage certain assets of the BP Plans.  Under ERISA, a person is a fiduciary only to the extent that person has fiduciary authority.  ERISA § 3(21), 29 U.S.C. §1002(21).

9.　　The Plan Committees have alleged that the SPIOC and NTI are parties to an Investment Manager Agreement, dated as of January 1, 2008, with respect to certain of the BP Plans; that the Investment Committee, BP Corporation North America, Inc. (for limited purposes described in the agreement), and NTI are parties to an Investment Manager Agreement, dated as of February 28, 2008, with respect to certain of the BP Plans; and that the BP Corporation North America, Inc. (for the benefit of the SPIOC) and NTI are parties to an Investment Manager Agreement, pursuant to an Assignment and Assumption Agreement dated on or about November 25, 2002, with respect to certain of the BP Plans.

10.　　Pursuant to the investment manager agreements described above (jointly, the "IMAs"), NTI was appointed as investment manager for certain assets of the BP Plans.  Those IMAs granted NTI only limited authority over the selected BP Plan assets.  The Plan Committees retained significant control over and responsibility for the investment and management of those assets.  Through the IMAs, the Plan Committees directed NTI to invest plan assets only in specific lending index funds managed by NTI, now called the NTGI-QM Collective Daily S&P 500 Equity Index Fund-Lending; the NTGI-QM Collective Daily Russell 2000 Index Fund-Lending; the NTGI-QM Collective Daily Aggregate Bond Index Fund-Lending; and the NTGI-QM Collective Daily Short Term Government Bond Index Fund-Lending (the "Lending Index Funds").

11.     The Plan Committees, at all times, had a duty to perform necessary and prudent due diligence, and to conduct a necessary and prudent investigation, in connection with and prior to giving the foregoing directions to NTI regarding investment of plan assets. Such duties of due diligence and investigation required the Plan Committees to know and understand, among other things, the characteristics of the investment in which plan assets are to be invested, including the securities lending component of those investments; any applicable fees; and the identities, roles, and responsibilities of persons (including any affiliates) involved in such investments.

### The Plan Committees Understood
### the Lending Activities of the Lending Index Funds.

12.     Dozens or even hundreds of other employee and retiree pension and savings plans (many established under ERISA), among other investors, invest in each of the Lending Index Funds. Each of such funds is a "Collective Fund" that is governed by the Amendment and Restatement of Declaration of Trust of the Northern Trust Global Investments Quantitative Management Collective Funds Trust, dated January 31, 2006 ("Declaration of Trust"), pursuant to which NTI is the trustee of each such Collective Fund. Investors in a Collective Fund, such as each of the BP Plans, are called "Participating Trusts." Among other things, such investors are bound by the Declaration of Trust as a condition of their investment. Provisions of the Declaration of Trust control over and supersede any contrary or inconsistent provisions in the IMAs.

13.     Participating Trusts do not own any individual security held by any Collective Fund. Participating Trusts own "Units" in the Collective Funds. "Units" are undivided interests in any such fund. Participating Trusts in a particular Collective Fund share gains and losses

proportionately with other investors in that fund. The BP Plans are Participating Trusts in the Lending Index Funds and own Units in those funds.

14.     NTI's duties as trustee include treating Participating Trusts in any one Lending Index Fund equitably and impartially.

15.     At all times relevant to this Counterclaim, the Plan Committees (i) knew that the Lending Index Funds were Collective Funds and that they were governed by the Declaration of Trust; and (ii) had been provided with copies of the Declaration of Trust and "Fund Declarations" relating to each Lending Index Fund that describe each of the Lending Index Funds. These documents identified NTI as the manager of the Lending Index Fund, and identified NTC as the securities lending agent for the lending activities of such funds.

16.     The trust instruments establishing the BP Plans authorize the Plan Committees to cause any part or all of plan assets to be commingled or collectively invested with the assets of trusts created by others by causing such plan assets to be invested as part of the funds created by any such commingled or collective or group funds or trusts.

17.     The Plan Committees selected NTI as investment manager for certain assets of the BP Plans, and also directed NTI to invest those assets in the NTI-managed Lending Index Funds. The Plan Committees retained significant and ultimate control over investment decisions concerning plan assets invested in the Lending Index Funds and the selection of investment options for plan assets. When the Plan Committees made the investment decisions that are the subject of this case, they knew that NTI would be managing the lending index funds in which plan assets were to be invested and that NTC would be the securities lending agent for such funds' securities lending activities. The Plan Committees expressly agreed to that arrangement.

18.     Even before the inception of the BP Plans' relationship with NTI, the Plan Committees knew, among other things, that the lending index funds in which they were to invest plan assets could engage in securities lending.   The Plan Committees intentionally chose to invest plan assets in funds that engaged in securities lending, and intentionally chose not to direct NTI to invest plan assets in funds that did not or would not engage in securities lending.

19.     On information and belief, the Plan Committees have authorized and directed the investment of plan assets in, and selected as plan investment options, securities lending collective funds that were not managed by NTI.

20.     At the same time, the Plan Committees knew that the Lending Index Funds in fact engaged in securities lending and earned and retained revenues through securities lending.   They knew that these funds would lend their securities to borrowers and receive certain collateral from the borrowers in return, and that cash collateral so received would be invested in fixed-income securities.   The Plan Committees knew that securities lending, including such investment of cash collateral, carried risks.   Notwithstanding their knowledge that securities lending carried risks, the Plan Committees selected the Lending Index Funds for investment of plan assets.   Long before filing this suit, when they learned of negative tracking variances in one or more of the Lending Index Funds resulting from securities lending activities, the Plan Committees made the decision to maintain the investment of plan assets in such funds and to maintain the Lending Index Funds as investment options.

21.     For years, the Plan Committees were aware of the nature of the fixed-income securities in which the referenced cash collateral was invested.   In fact, the Plan Committees knew for years that cash collateral received from borrowers could be invested in various cash

collateral investment options, including the Collective Short Term Extendible Portfolio ("STEP").

22.     The cash collateral received from borrowers of securities from the Lending Index Funds was invested, at relevant times, in the Core USA collateral pool and/or the STIF/STEP custom collateral fund (hereafter, the "Collateral Pools").  The Plan Committees approved, ratified, and acquiesced in this investment of cash collateral.

23.     From the inception of the BP Plans' relationship with NTI, the Plan Committees knew, among other things, that (i) NTI had appointed its affiliate, NTC, to serve as securities lending agent for the Lending Index Funds, with responsibility for administering the securities lending program; and (ii) NTC would receive a monthly fee specified in writing as a percentage of certain securities lending revenue earned by those funds as compensation for its services.  The Plan Committees specifically authorized payment of this fee.

24.     None of the IMAs set a cap on the percentage of Lending Index Fund securities that could be lent.  The Fund Declarations did not set any such caps.  And the Declaration of Trust did not set any such cap.  At all times relevant to this Counterclaim, the Plan Committees knew that none of these documents capped the amount of Lending Index Fund securities that could be lent, and also knew about the extent to which securities in the Lending Index Funds were on loan.  The Plan Committees authorized up to 100% of the Lending Index Fund assets to participate in securities lending.

**The Plan Committees Owed the BP Plans Important Duties.**

25.     The Plan Committees were each required to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity

and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in connection with: (i) appointing and retaining NTI as investment manager; (ii) establishing investment guidelines under which NTI's authority was limited to investing in the Lending Index Funds; (iii) directing NTI on how to invest plan assets and selecting investment options for the BP Plans; and (iv) monitoring the continuing appropriateness of the investment manager, the investment guidelines, and the investments and investment options selected by the Plan Committees.

26.    In connection with the Plan Committees' directions to NTI as to how to invest plan assets and their selection of investment options, the Plan Committees had a fiduciary duty to give appropriate consideration to such facts and circumstances as the risk of loss and the opportunity for gain; the diversification of each of the BP Plans' portfolios; the liquidity and current return of each of the BP Plans' portfolios relative to the anticipated cash flow requirement of such plans; and the projected return of each of the BP Plans' portfolios relative to the funding objectives of such plans.  That duty included, without limitation, a responsibility to understand and assess, among other things, the structure, risks, and costs of the securities lending component of each Lending Index Fund.

27.    The Plan Committees had the foregoing fiduciary duties when they initially directed NTI to invest in the Lending Index Funds or chose those funds as investment options for the BP Plans, and with respect to each additional investment in such funds.  And the Plan Committees had such fiduciary duties on an ongoing basis after each investment, and after selection of each of the funds as investment options, to ensure that each was and continued to be in compliance with the terms of the applicable trusts and statutory standards; that it satisfied the needs of such trusts; and that it continued to be an appropriate investment.

28.     At all times, the Plan Committees were required themselves to have the requisite expertise, knowledge, and information to understand how to fulfill the foregoing fiduciary duties, including to understand the structure of, and the nature of the risks, costs, and potential returns of, the transactions in which the investment manager is or may be authorized to engage, including securities lending.  If the Plan Committees lacked that expertise, knowledge, and information, they were required to consult experts or others in order to fulfill their fiduciary duties.

### If the Plan Committees' Allegations are True, They Failed to Fulfill the Fiduciary Duties that They Owed to the BP Plans.

29.     In this case, the Plan Committees allege that the acts and omissions of NTC and NTI violated fiduciary duties that NTC and NTI owed to the BP Plans.  NTC and NTI deny all such allegations, but if those allegations were established, in whole or in part, then the Plan Committees would be wholly liable for any injuries and damages to the BP Plans, because as named fiduciaries of the BP Plans with, and retaining, control over the plan investments, the Plan Committees were substantially more at fault than were NTC and NTI for such injuries and damages.

30.     For example, the Plan Committees take the position that before selecting the Lending Index Funds as an investment option for the BP Plans, they: (i) did not fully understand the securities lending fee compensation arrangement; (ii) did not authorize the securities lending fee compensation arrangement in writing; (iii) reasonably needed to—but did not—receive a copy of the Securities Lending Authorization Agreement entered into between NTC and NTI and effective August 6, 2006 in order to authorize the securities lending fee compensation

arrangement and/or to engage in securities lending; and (iv) did not know that the securities lending agent, NTC, did not share in credit losses associated with securities lending activities.

31.     Assuming that any of these allegations is found to be true in this case—which NTC and NTI deny—the Plan Committees' alleged failure to obtain and understand this information before making the subject investments or selecting them as an investment options, or in connection with monitoring those investments and options once made, constituted a primary and active breach of trust and fiduciary duty by the Plan Committees such that they are substantially more at fault than NTI or NTC for any alleged losses to the BP Plans.  Such an alleged failure by the Plan Committees would amount to inadequate due diligence and investigation at the time of making the investment or selecting it as an investment option, and in monitoring it thereafter, and would constitute a failure to administer the trust investments diligently and prudently, and for those reasons, among others, would violate the Plan Committees' duties under ERISA.

32.     In any event, the Plan Committees knew, and should have known, of the material attributes of NTC's compensation and responsibility, if any, for losses in connection with securities lending services.  If those arrangements are found to be imprudent, to constitute a prohibited transaction as to which no exemption applies, or to constitute a breach of trust or fiduciary duty—which they are not and which NTC and NTI deny—then the Plan Committees breached their ERISA fiduciary duties by causing the BP Plans to be invested under an arrangement that they knew to be imprudent or to involve non-exempt prohibited transactions and other fiduciary breaches.  In that case, the Plan Committees participated knowingly in, and knowingly undertook to conceal, the alleged acts or omissions of NTC and NTI, knowing those alleged acts and omissions to constitute breaches of fiduciary duties or non-exempt prohibited

transactions.  And if  those arrangements are found to be imprudent or to constitute a breach of trust or fiduciary duty or a non-exempt prohibited transaction—which they are not and which NTC and NTI deny—then the Plan Committees (i) engaged and participated in; (ii) approved, ratified, acquiesced in, or concealed; (iii) neglected to take proper steps to redress; or (iv) enabled NTC and NTI to commit, that alleged breach or imprudence or non-exempt prohibited transaction.  In connection with the foregoing conduct, the Plan Committees were substantially more at fault than NTC and NTI were and could be.

33.     The Plan Committees also take the position that before selecting the Lending Index Funds for investment or as an investment option for the BP Plans, they believed that the Collateral Pools were essentially a cash substitute.  They take the position that they believed that the Collateral Pools were invested to withstand the perfect storm of events that come along once in a hundred years.

34.     Assuming that any of these allegations is found to be true in this case—which NTC and NTI deny—the Plan Committees' alleged failure to obtain information about the composition of the Collateral Pools and the way in which cash collateral would be invested before making investments in the Lending Index Funds, selecting them as an investment option, or monitoring those investments and options once made, constituted a primary and active breach of trust and fiduciary duty by the Plan Committees such that they are substantially more at fault than NTC or NTI for any alleged losses to the BP Plans.  Such an alleged failure by the Plan Committees would amount to inadequate due diligence and investigation at the time of making the investment or selecting it as an investment option, and in monitoring it thereafter, and would constitute a failure to administer the trust investments diligently and prudently, and for those reasons, among others, would violate the Plan Committees' duties under ERISA.

35.     In fact, at the time they invested in the Lending Index Funds or chose them as investment options, and during their monitoring of those investments, the Plan Committees knew that (i) cash collateral received from lending securities was not invested in the types of securities in which they *now* say they thought they were invested; and (ii) the Collateral Pools would not have the type of liquidity that they *now* say they thought they would have.  If the investment of cash collateral in this case is found to be imprudent or to constitute a breach of trust or fiduciary duty—which it was not and which NTC and NTI deny—then the Plan Committees participated knowingly in, and knowingly undertook to conceal, the alleged acts or omissions of NTC and NTI, knowing those alleged acts and omissions to constitute breaches of fiduciary duties.  And if the cash collateral investment is found to be imprudent or to constitute a breach of trust or fiduciary duty—which it was not and which NTC and NTI deny—then the Plan Committees (i) engaged and participated in; (ii) approved, ratified, acquiesced in, or concealed; (iii) neglected to take proper steps to redress; or (iv) enabled NTC and NTI to commit, that alleged breach or imprudence.  In connection with the foregoing conduct, the Plan Committees were substantially more at fault than NTC and NTI were and could be.

36.     The Plan Committees take the position that before selecting the Lending Index Funds for investment or as an investment option for the BP Plans, they did not understand the extent to which securities in those funds would be lent and that the funds were excessively lent.

37.     Assuming that any of these allegations is found to be true in this case—which NTI and NTC deny—the Plan Committees' alleged failure to obtain information about, and to understand, the scope and extent of securities lending by the funds before making investments in those funds, selecting them as an investment option, or monitoring those investments and options once made, constituted a primary and active breach of trust and fiduciary duty by the Plan

Committees such that they are substantially more at fault than NTC or NTI for any alleged losses to the BP Plans. Such an alleged failure by the Plan Committees would amount to inadequate due diligence and investigation at the time of making the investment or selecting it as an investment option, and in monitoring it thereafter, and would constitute a failure to administer the trust investments diligently and prudently, and for those reasons, among others, would violate the Plan Committees' duties under ERISA.

38.     In fact, at the time they invested in the Lending Index Funds or chose them as investment options, and during their monitoring of those investments, the Plan Committees knew, and by causing the BP Plans' investment, authorized, the extent of the lending of those funds. The Plan Committees also knew that neither the Declaration of Trust, nor the Fund Declarations, nor the IMAs imposed caps on the extent of securities lending. If the extent of such lending in this case is found to be imprudent or to constitute a breach of trust or fiduciary duty—which it was not and which NTC and NTI deny—then the Plan Committees participated knowingly in, and knowingly undertook to conceal, the alleged acts or omissions of NTC and NTI, knowing those alleged acts and omissions to constitute breaches of fiduciary duties. And if the extent of such lending is found to be imprudent or to constitute a breach of trust or fiduciary duty—which it was not and which NTC and NTI deny—then the Plan Committees actively (i) engaged and participated in; (ii) approved, ratified, acquiesced in, or concealed; (iii) neglected to take proper steps to redress; or (iv) enabled NTC and NTI to commit, that alleged breach or imprudence. In connection with the foregoing conduct, the Plan Committees were substantially more at fault than NTC and NTI were and could be.

39.     The Plan Committees also allege that NTI's acting both as a trustee under the IMAs and as a trustee under the Declaration of Trust constituted a conflict of interest in violation

48

of ERISA, because NTI allegedly placed itself in a conflict between (i) a duty to act solely in the interest of participants in the BP Plans and (ii) a duty to treat equitably the Participating Trusts that had invested in the Collective Funds.

40.     Assuming that any of these allegations is found to be true in this case—which NTC and NTI deny—the Plan Committees' alleged failure to obtain sufficient information about the duties of NTI under the IMAs and the Declaration of Trust before making investments in those funds, selecting them as an investment option, or monitoring those investments and options once made, constituted a primary and active breach of trust and fiduciary duty by the Plan Committees such that they are substantially more at fault than NTC or NTI for any alleged losses to the BP Plans.  Such an alleged failure by the Plan Committees would amount to inadequate due diligence and investigation at the time of making the investment or selecting it as an investment option, and in monitoring it thereafter, and would constitute a failure to administer the trust investments diligently and prudently, and for those reasons, among others, would violate the Plan Committees' duties under ERISA.

41.     In fact, at the time they invested in the Lending Index Funds or chose them as investment options, and during their monitoring of those investments, the Plan Committees knew the duties and roles of NTI under the IMAs and the Declaration of Trust.  If NTI's undertaking of those duties in this case is found to be imprudent, to constitute a prohibited transaction as to which no exemption applies, or to constitute a breach of trust or fiduciary duty—which it was not and which NTC and NTI deny—then the Plan Committees participated knowingly in, and knowingly undertook to conceal, the alleged acts or omissions of NTC and NTI, knowing those alleged acts and omissions to be imprudent or to constitute breaches of fiduciary duties or non-exempt prohibited transactions.   And if NTI's undertaking of those duties is found to be

imprudent, to constitute a prohibited transaction as to which no exemption applies, or to constitute a breach of trust or fiduciary duty—which it was not and which NTC and NTI deny— then the Plan Committees (i) engaged and participated in; (ii) approved, ratified, acquiesced in, or concealed; (iii) neglected to take proper steps to redress; or (iv) enabled NTC and NTI to commit, that alleged breach or imprudence or non-exempt prohibited transaction. In connection with the foregoing conduct, the Plan Committees were substantially more at fault than NTC and NTI were and could be.

42. The Plan Committees also allege that NTI had a self-interest in expanding and maintaining the securities lending program to generate increased revenues for itself at the expense of the BP Plans, and that NTI never notified the Plan Committees of that self-interest.

43. In fact, at the time they invested in the Lending Index Funds or chose them as investment options, and during their monitoring of those investments, the Plan Committees knew, and received notice of, the duties and roles of NTC and NTI in connection with the funds' securities lending activities. The Plan Committees chose to select and maintain the investment of plan assets in the Lending Index Funds and the selection of such funds as investment options, notwithstanding their knowledge of the roles and responsibilities of NTC and NTI concerning securities lending. If NTI's conduct in this respect is found to be imprudent, to constitute a prohibited transaction as to which no exemption applies, or to constitute a breach of trust or fiduciary duty—which it was not and which NTC and NTI deny—then the Plan Committees participated knowingly in, and knowingly undertook to conceal, the alleged acts or omissions of NTC and NTI, knowing those alleged acts and omissions to be imprudent or to constitute breaches of fiduciary duties or non-exempt prohibited transactions. And if NTI's conduct in this respect is found to be imprudent, to constitute a prohibited transaction as to which no exemption

50

applies, or to constitute a breach of trust or fiduciary duty—which it was not and which NTC and NTI deny—then the Plan Committees (i) engaged and participated in; (ii) approved, ratified, acquiesced in, or concealed; (iii) neglected to take proper steps to redress; or (iv) enabled NTC and NTI to commit, that alleged breach or imprudence or non-exempt prohibited transaction.  In connection with the foregoing conduct, the Plan Committees were substantially more at fault than NTC and NTI were and could be.

44.     Assuming that any of the allegations described in Paragraphs 30, 33, 36, 39, or 42 of these counterclaims is found to be true in this case—which NTI and NTC deny—the Plan Committees would be substantially at fault.  In that event, the Plan Committees' failure to obtain sufficient information, and failure to take into account information that they had or that was available or provided to them, about securities lending, before making investments in the Lending Index Funds, selecting them as an investment option, or monitoring those investments and options once made, constituted a primary and active breach of trust and fiduciary duty by the Plan Committees such that they are substantially more at fault than NTC or NTI for any alleged losses to the BP Plans.  Such an alleged failure by the Plan Committees would amount to inadequate due diligence and investigation at the time of making the investment or selecting it as an investment option, and in monitoring it thereafter, and would constitute a failure to administer the trust investments diligently and prudently, and for those reasons, among others, would violate the Plan Committees' duties under ERISA.

45.     To the extent that any BP Plans have suffered losses as a result of investing in, or failing to earlier redeem Units in, the Lending Index Funds, none of such losses were caused by any failure by NTC or NTI to notify or disclose to the Plan Committees information about (i) the funds; (ii) the funds' securities lending activities or securities lending generally; (iii) the risks of

securities lending by the funds or generally; or (iv) the roles, responsibilities, or fees of NTC and NTI (or lending agents and affiliated investment managers generally) in connection with these funds or lending index funds generally. Nor were any such losses caused by any lack of knowledge about the foregoing issues by the Plan Committees or by any wrongful conduct by NTC or NTI. At all relevant times, the Plan Committees were aware of the information that they claim should have been disclosed to them, and nevertheless made and maintained the investments about which they complain in this case. Any alleged losses to the BP Plans were directly caused and exacerbated by the Plan Committees' own failure to act diligently and prudently as herein described, in violation of their duties under ERISA.

**Count I**
**(Indemnification)**

46.     NTC and NTI repeat and reallege the allegations in paragraphs 1 through 45 of these Counterclaims as if fully set forth herein.

47.     NTC and NTI deny any liability with respect to the matters alleged by the Plan Committees in their Amended Complaint and further deny that the actions or omissions alleged against them by the Plan Committees constitute violations of law, contract, or fiduciary duties under ERISA, or caused any injuries or damages to the BP Plans. Nevertheless, if NTC and NTI are found liable to the BP Plans on any claim, it will be due to the wrongful acts or omissions of the Plan Committees as alleged herein.

48.     To the extent the Plan Committees prevail on some or all of their claims against NTC and NTI, NTC and NTI have only a secondary, derivative, or vicarious liability, and the Plan Committees have substantially more responsibility, for any alleged injuries or damages

suffered by the BP Plans because any such injuries or damages were caused completely and substantially by the acts and omissions of the Plan Committees.

49.     NTC and NTI are therefore entitled to equitable and implied indemnification under ERISA, and under federal ERISA common law, from the Plan Committees for all injuries and damages for which NTC and NTI may be found to be liable to the BP Plans.

50.     To the extent the Plan Committees prevail on their claims against NTC and NTI, the Plan Committees are primarily liable to the BP Plans, and NTC and NTI are entitled to equitable and implied indemnification.

51.     By their acts and omissions described above, the Plan Committees are also responsible for expenses, including attorney's fees and costs, incurred by NTC and NTI in litigating this action.

WHEREFORE, NTC and NTI pray for judgment in their favor and against the Plan Committees in the amount of any and all costs, damages, and liabilities to the BP Plans that NTC and NTI may incur in this action, plus interest and attorney's fees and costs.

## Count II
### (Contribution)

52.     NTC and NTI repeat and reallege the allegations in paragraphs 1 through 45 of these Counterclaims as if fully set forth herein.

53.     NTC and NTI deny any liability with respect to the matters alleged by the Plan Committees in their Amended Complaint and further deny that the actions or omissions alleged against them by the Plan Committees constitute violations of law, contract, or fiduciary duties under ERISA, or caused any injuries or damages to the BP Plans.  Nevertheless, if NTC and NTI

are found liable to the BP Plans on any claim, it will be due to the wrongful acts or omissions of the Plan Committees as alleged herein.

54. To the extent the Plan Committees prevail on some or all of their claims against NTC and NTI, NTC and NTI are entitled to contribution from the Plan Committees under ERISA, and under federal ERISA common law, for the Plan Committees' proportionate responsibility for the injuries and damages allegedly suffered by the BP Plans, because any such injuries and damages were caused partially or wholly by the wrongful acts and omissions of the Plan Committees. Absent contribution, NTC and NTI will or may discharge more than their proportionate share of alleged liability (if any) to the BP Plans, which liability is either secondary or, at most, in common with, the Plan Committees' liability to the BP Plans.

55. By their wrongful acts and omissions as set forth above, the Plan Committees have caused, and will continue to cause, NTC and NTI to incur substantial costs, damages, and liabilities with respect to the matters alleged in the Amended Complaint.

56. NTC and NTI are therefore entitled to equitable and implied contribution from the Plan Committees for all such injuries and damages for which NTC and NTI may be found to be liable to the BP Plans.

57. The costs, damages, and liabilities that have been or may be incurred by NTC and NTI with respect to the matters alleged in the Amended Complaint are, and will continue to be, in excess of any proportionate or equitable share of such costs, damages, and liabilities as may be attributable to the conduct of NTC and NTI.

58. By the acts and omissions described above, the Plan Committees are also responsible for expenses, including attorney's fees and costs, incurred by NTC and NTI in litigating this action.

WHEREFORE, NTC and NTI pray for judgment in their favor and against the Plan Committees in any amount by which their costs, damages, and liabilities to the BP Plans exceed Counterclaim-plaintiffs' proportionate share of such amounts, plus interest and attorney's fees and costs.

Respectfully submitted,

Dated: July 7, 2009

/s/ Caryn L. Jacobs

Caryn L. Jacobs
John J. Tharp, Jr.
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

*Attorneys for The Northern Trust Company and Northern Trust Investments, N.A.*